UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ALLSTATE INSURANCE COMPANY; ALLSTATE
INDEMNITY COMPANY; ALLSTATE PROPERTY
AND CASUALTY INSURANCE COMPANY;
ALLSTATE FIRE & CASUALTY INSURANCE
COMPANY,

                                           Docket No.: 17-cv-1139

                   Plaintiffs,

                                        Plaintiff Demands
                                         a Trial by Jury

   -against-


JAIME GUTIERREZ, M.D. and JOHN DOE ONE
through JOHN DOE FIVE,
                    ("**Individual Defendants**"),

    -and-

ALLEVIATION MEDICAL SERVICES, P.C.,
                    ("**Provider Defendant**"),


                        collectively, the Defendants.
-----------------------------------------------------------------------X

## <u>COMPLAINT</u>

      Plaintiffs, Allstate Insurance Company, Allstate  Indemnity Company, Allstate Property

and Casualty Insurance Company, Allstate Fire & Casualty Insurance Company (collectively

"ALLSTATE" or "Plaintiffs"), by their attorneys, ABRAMS, COHEN & ASSOCIATES, for the

Complaint in this action, hereby allege, upon information and belief, the following:

      1.    This action seeks: a) a declaratory judgment pursuant to 28 U.S.C. §§  2201 and

2202 that ALLSTATE is not legally obligated to pay Defendant ALLEVIATION MEDICAL

SERVICES, P.C. (hereinafter, "ALLEVIATION") and Defendant JAIME GUTIERREZ, M.D.

(hereinafter, "GUTIERREZ") approximately One Million Six Hundred and Six Thousand Four

Hundred and Thirty-One Dollars and Ninety-One Cents ($1,606,431.91) in pending or future fraudulent claims for medical services that the Defendants allegedly rendered to individuals who were involved in automobile accidents and who were eligible for insurance coverage under ALLSTATE's insurance policies (hereinafter, "Insureds"); and, b) restitution of more than Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56) for payments that Defendants ALLEVIATION and GUTIERREZ fraudulently obtained from ALLSTATE.[1]

2.       The Defendants have engaged in a systematic scheme to defraud Plaintiffs and their actions continue to be a threat to the general welfare and safety of patients in New York State.  The Defendants' scheme includes the submission of bills under the New York No-Fault system for medical services that are performed by non-physicians without proper supervision and in a potentially very dangerous manner.

3.       The relief requested shall be predicated upon proof made by the Plaintiffs that:

i.    The Defendants' actions are a threat to the public health.  Many of the medical services billed by the Defendants, including the administration of trigger point injections - if performed at all - are performed by non-physicians without proper supervision.  The Defendants have made false and misleading representations to ALLSTATE by submitting claims all providing that Defendant GUTIERREZ, a licensed physician, is the only treating provider of the services purportedly rendered and is ALLEVIATION's only owner and operator.  However, GUTIERREZ was not present for, and did not perform, or even supervise, many of the

---

[1] This sum does not include payments that ALLSTATE made to the Defendants ALLEVIATION and GUTIERREZ in the course of, or as a result of, litigation or arbitration proceedings.

medical services billed.  By representing that GUTIERREZ is the only "treating provider" of the medical services supposedly rendered, Defendants are in violation of New York Education Law §§ 6512, 6522 and 6530, the New York State Rules of the Board of Regents §§ 29.1(5), 29.1(10) and 29.2(5) and potentially Penal Law § 20.00.

ii. When the medical services billed by the Defendants are actually performed, they are being administered in a potentially very dangerous manner.  According to GUTIERREZ's own sworn testimony at examinations under oath (hereinafter referred to as "EUOs"), <u>GUTIERREZ admitted that he does not know the safe amounts of medications that are to be injected into patients during the administration of trigger point injections</u>.  Moreover, because GUTIERREZ's specialty is Plastic Surgery/Hand Surgery, he has not engaged in the practice of physical medicine and rehabilitation through ALLEVIATION, although the services this Defendant supposedly renders are in this medical field.

iii. The Defendants' false and misleading misrepresentations to ALLSTATE include the submission of claims providing that the medical services billed and supposedly rendered to patients were medically necessary and incorporated the required components of the New York State Workers' Compensation Medical Fee Schedule (hereinafter, "Fee Schedule").  This includes false and misleading billing for reimbursement of medical services in violation of Insurance Law § 5108, including but not limited to billing for trigger point injections, consultations and office visits,

3

"Outcome Assessment Testing" and "Performance Tests and Measurements" at rates that are above those allowed in the Fee Schedule. Even if these services were actually performed and billed at the correct rate, the rendering of this testing and treatment constitutes a violation of §29.02(7) of the New York State Rules of the Board of Regents because these services are excessive and are not warranted by the conditions of the respective patients. These false representations were made by Defendants in order to justify payment for services that were not medically necessary, were either rendered by non-reimbursable providers or were never rendered at all. They were also made for the purpose of demonstrating that GUTIERREZ and ALLEVIATION were in conformance with the No-Fault laws, which is required in order to obligate ALLSTATE to make No-Fault payments to the Defendants.

iv. Defendant ALLEVIATION is fraudulently incorporated, owned and controlled by non-medical professionals and is not eligible to recover benefits under the New York No-Fault statutes. It is nominally owned "on paper" by GUTIERREZ, a physician whose specialty is Plastic Surgery/Hand Surgery, and who has limited knowledge about ALLEVIATION's business operations and the services it purportedly renders. GUTIERREZ's nominal ownership and control of ALLEVIATION is a nullity for the purposes of the No-Fault law, evidences actual ownership by as yet unidentified non-medical professionals in contravention of the No-Fault laws and results in

4

GUTIERREZ's and ALLEVIATION's ineligibility to recover No-Fault benefits.

v. Defendants GUTIERREZ and ALLEVIATION have engaged in unlawful fee splitting with non-medical professionals and, therefore, are ineligible to recover No-Fault benefits;

vi. Defendants GUTIERREZ and ALLEVIATION failed to appear for duly scheduled EUOs with respect to numerous No-Fault claims. GUTIERREZ and ALLEVIATION's failure to appear for these duly noticed EUOs is a violation of a condition precedent to coverage and ALLSTATE is not required to pay or reimburse first-party No-Fault benefits for any of these No-Fault claims.

4.     In addition to the declaratory relief requested, Plaintiffs seek recovery of more than Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56) that the Defendants have wrongfully obtained from ALLSTATE by submitting, or causing to be submitted, thousands of fraudulent charges for medical services that allegedly were rendered to ALLSTATE's Insureds.   Such monies were obtained after the submission of claims containing the same or substantially the same false and misleading representations as described above.   These claims deceived Plaintiffs, who acted in reliance thereon and made payments that unjustly enriched the Defendants.   Exhibit "A" contains a representative sample of the bills submitted to Allstate by Defendants GUTIERREZ and ALLEVIATION.

## INTRODUCTION

5.      As more fully discussed below, the Defendants have engaged in a systematic scheme to defraud Plaintiffs and their actions continue to be a threat to the public safety and general welfare of the people of New York State.   The Defendants' scheme includes the submission of bills under the New York No-Fault system for medical services that are not necessary, that are not performed by licensed physicians and for which they are not entitled to reimbursement.   Moreover, when these services are actually rendered, they are being administered in a potentially dangerous manner, putting the public's health at risk.

6.      The Defendants at all times have known that the claims submitted to ALLSTATE were fraudulent because:

    i.   Although all claim forms submitted by Defendants to ALLSTATE provide that GUTIERREZ personally conducted all of the testing, examinations and treatment allegedly performed, many of these services were not rendered or were rendered by non-physicians without any supervision by GUTIERREZ.

    ii.  Defendant GUTIERREZ is a plastic surgeon and has not practiced medicine in reference to the services he purports to render.  By his own admissions, GUTIERREZ has little or no knowledge of the medical services allegedly performed, including the medications supposedly administered and their respective safe dosages.

    iii. By his own admissions, Defendant GUTIERREZ also has little or no knowledge about material aspects of ALLEVIATION's business

operations, although he is listed as the sole officer, director and shareholder and as the only "treating provider" of services.

iv. The Defendants intentionally inflated the charges to the Plaintiffs based upon an exploitation of billing under the Fee Schedule and New York's No-Fault laws.

v. The Defendants' claims have wholly misrepresented the nature, quality, duration and other characteristics of the medical services that were actually provided to patients.

vi. Any medical services that were actually rendered were not medically necessary and were not warranted by the conditions of the respective patients.

7.     As a result of the Defendants' fraudulent scheme, ALLSTATE has been billed approximately Two Million Five Hundred and Eighty-Nine Thousand Five Hundred and Eighty-Two Dollars ($2,589,582.00) by GUTIERREZ and ALLEVIATION since its inception, and Allstate has incurred damages exceeding Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56) in those same time periods.

8.     Plaintiffs have paid false and inflated claims submitted by GUTIERREZ and the fraudulently incorporated ALLEVIATION and now seek repayment of this money, as well as additional damages for the Defendants' wrongful behavior.

**PARTIES**

9.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are wholly

owned subsidiaries of The Allstate Corporation, an entity organized to exist under and by virtue of the laws of the State of Delaware.

10.   Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company maintain their principal places of business in Northbrook, Illinois.

11.   Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.   Upon information and belief, at all times pertinent herein, Defendant GUTIERREZ is a citizen of New York State, resides in the County of Kings, State of New York and is a physician who has been licensed to practice medicine in New York since December 23, 2010.  GUTIERREZ's specialty is Plastic Surgery/Hand Surgery, but he is listed as the "owner" of ALLEVIATION and the "treating provider" of all medical services on all bills the Defendants submitted to ALLSTATE.  As more fully discussed below, GUTIERREZ bills Plaintiffs for the performance of medical services that he supposedly always performs.  However, GUTIERREZ does not render many of the services billed, does not exercise appropriate supervision and control over the services purportedly rendered and does not engage in the practice of medicine through these services.  Many such services were not provided at all, were performed by non-physicians or when performed were rendered in an inappropriate manner potentially dangerous to the patients treated.  The services also were not medically necessary and did not incorporate the required components as provided in the Fee Schedule.

13.   Upon information and belief, at all times pertinent herein, ALLEVIATION is a fraudulently incorporated New York medical professional service corporation through which

many medical services are billed to Plaintiffs.  Its principal place of business is located at 100 Jay Street, Unit 23C, Brooklyn, New York 11201.  ALLEVIATION is allegedly owned by GUTIERREZ.  Both GUTIERREZ and ALLEVIATION bill ALLSTATE for the performance of various testing, examinations and treatment, although the named owner, GUTIEREZ, has no knowledge of ALLEVIATION's business operations and of most of the services that it purports to render, and does not practice medicine through these services.  ALLEVIATION is nominally owned "on paper" by GUTIERREZ, but it is actually owned and controlled by unidentified individuals or entities that are not licensed to practice medicine.

14.    Upon information and belief, Defendants JOHN DOE ONE through JOHN DOE FIVE reside in and are citizens of the State of New York.  JOHN DOE ONE through JOHN DOE FIVE are persons who are presently not identifiable but must be associated with GUTIERREZ and ALLEVIATION, and are involved in ALLEVIATION's unlawful ownership and operation and in the fraudulent scheme committed against ALLSTATE and other New York automobile insurers.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.    Venue in this District is appropriate pursuant to 28 U.S.C. §1391, as the Eastern District of New York is the District where one or more of the Defendants reside and is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL AND LEGAL ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

### Licensing Statutes and the No-Fault Laws

17.     The State of New York regulates the practice of medicine and restricts it and the ownership of medical professional corporations to licensed physicians.  The State does so in order to protect consumers and the public health. Only licensed physicians, subject to the regulation and oversight of the State, are permitted to practice medicine.

18.     The use of the title "physician" by one who is not a physician is prohibited by New York Education Law § 6513.  The practice of medicine by one who is not a physician, and the aiding or abetting of same, are felonies pursuant to New York Education Law § 6512 and New York Penal Law § 20.00.  The sale of a medical license is a felony under New York Education Law § 6512.  Only doctors of medicine and osteopathy are permitted to use the title of physician and are included in New York's Education Law authorizing the practice of medicine. See N.Y. Education Law §§ 6522, 6524.  It is professional misconduct for a physician to permit, aid or abet an unlicensed person to perform the activities of a physician.  See N.Y. Education Law § 6530 (11).  It is also professional misconduct for a physician to order excessive tests or treatment. See N.Y. Education Law § 6530 (35).  Pursuant to the NYS Rules of the Board of Regents, it is unprofessional conduct to delegate professional responsibilities to a person who is not qualified to perform them and to fail to exercise appropriate supervision over persons who are authorized to practice only under the supervision of a licensed professional.  See NYS Rules of the Board of Regents §§ 29.1 (10), 29.2 (5).  Moreover, it is unprofessional conduct to order excessive tests and treatment not warranted by the condition of the patient. See NYS Rules of the Board of Regents § 29.2 (7).  This statutory framework is designed to protect the public and to ensure that medical services are provided appropriately and only by licensed physicians.

19.     The State of New York requires that insurers provide No-Fault insurance benefits to persons injured in automobile accidents pursuant to Article 51 of the Insurance Law. ALLSTATE underwrites automobile insurance in the State of New York.

20.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the medically necessary healthcare services that they require.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 *et seq.*) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 *et seq.*) (hereinafter, collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Insureds.

21.     No-Fault benefits include up to $50,000.00 per Insured per accident for necessary expenses incurred for health care goods and services.

22.     An Insured can assign his or her right to No-Fault benefits to the providers of health care services in exchange for those services. 11 N.Y.C.R.R. § 65-3.11.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

23.     Pursuant to regulations promulgated by New York's Department of Financial Services, a health provider, to be paid, must submit certain information in a New York No-Fault claim.  This information includes the name of the treating provider and the type of service that

was provided.  Pursuant to New York Insurance Law § 5108, the services are billed under, and

the benefits are subject to, the New York State Worker's Compensation Medical Fee Schedule.

If the provider is a professional service corporation, the health provider is also required to state

the owner of the corporation and his or her professional licensing credentials.  Pursuant to the

Department of Financial Services regulations, 11 NYCRR § 65-3.16(a)(6), health services must

be provided by a licensed provider within the scope of his or her license to be compensated

under the No-Fault Laws.

24.     According to New York State Insurance Law § 403, the NF-3 and HCFA-1500

Forms submitted by healthcare providers to ALLSTATE and to all other insurers must be

verified subject to the following warning:

> Any person who knowingly and with intent to defraud any
> insurance company or other person files an application for
> insurance or statement of claim containing any materially false
> information, or conceals for the purpose of misleading, information
> concerning any fact material thereto, commits a fraudulent
> insurance act, which is a crime.

25.     Moreover, pursuant to the No-Fault Laws, fraudulently incorporated professional

service corporations are not eligible to bill for or receive No-Fault benefits.  Similarly ineligible

are professional service corporations that are nominally owned by doctors who do not actually

practice medicine through these corporations. See State Farm v. Mallela, 4 N.Y.3d 313 (N.Y.

2005).

26.     The No-Fault Laws provide, in pertinent part:

> A provider of health care services is *not eligible* for reimbursement
> under section 5102(a)(1) of the Insurance Law if the provider fails
> to meet any applicable New York State or local licensing
> requirement necessary to perform such service in New York.

See 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

12

27.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a professional service corporation authorized to practice medicine; (iii) employ and supervise other physicians; or (iv) derive economic benefit from physician services. Furthermore, under the No-Fault Laws, healthcare service providers are not eligible to receive No-Fault benefits if they engage in fee splitting with non-medical professionals, which is conduct prohibited by New York's Education Law.

28.     New York law also requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through that professional corporation in order for it to be lawfully licensed.  Under the No-Fault Laws, professional service corporations are not eligible to receive No-Fault benefits if they are owned by physicians who do not engage in the practice of medicine through these professional corporations.

29.     In State Farm v. Mallela, 4 N.Y.3d 313 (N.Y. 2005), the New York Court of Appeals upheld 11 NYCRR § 65-3.16(a)(12), holding that medical corporations that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) are not entitled to reimbursement.

30.     In Metroscan Imaging, P.C. v. Allstate, 823 N.Y.S.2d 818 (2d Dept. 2006), it was held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid after April 5, 2002 (the effective date of 11 NYCRR § 65-3.16(a)(12)).

## Background of the Defendants' Fraudulent Scheme

31.     The Defendants' actions are an assault upon the licensing laws of New York State, laws designed to protect the public against fraud, unethical behavior and incompetence.  The Defendants' misrepresentations clearly illustrate why New York's medical licensing protections

exist in the first place.  The Defendants have sought to circumvent these requirements, and have proceeded to practice medicine in a fraudulent and incompetent fashion that constitutes a danger to patients and to the public at large.

32.     GUTIERREZ testified at two EUOs, one on June 14, 2011 and one on December 9, 2011.  Pursuant to GUTIERREZ's EUO testimony, prior to practicing medicine in New York, GUTIERREZ worked at an aesthetic medical facility in Miami, Florida.  GUTIERREZ testified at his EUOs that when he came to New York, the first medical facility that GUTIERREZ worked at was located at 1468 Flatbush Avenue in Brooklyn, New York.

33.     The 1468 Flatbush Avenue, Brooklyn, New York location has a long history of involvement with No-Fault fraud.  In the late 1990's, purported professional corporations that were actually controlled by a layperson worked out of this location.  Through a billing service, this layperson operated the medical practices and fraudulently billed insurers through the No-Fault Laws.  The individual was indicted in Kings County in relation to this scheme and pled guilty to felony charges.[2]  Additionally, in an action filed under the Federal Racketeer Influenced and Corrupt Organizations Act by several insurers, Judge Charles Sifton found that that the nominal respective owners of the professional corporations operating out of 1468 Flatbush Avenue, Brooklyn, New York had effectively transferred all ownership and control of these corporations to the billing company run by a layperson. See Allstate Insurance Company v. TMR Medibill, Inc., 2000 U.S. Dist. LEXIS 23142, 2000 WL 34011895 (E.D.N.Y. July 13, 2000)

34.     On April 7, 2014, GUTIERREZ and ALLEVIATION filed a lawsuit in Bronx County Supreme Court against an attorney that formerly represented them.  This suit alleges that the attorney settled many claims for a cumulative amount in the "millions," has held funds in

_____

[2] Ellen Burach Zion, one of the undersigned attorneys, was a member of the King's County District Attorney's Office team that was involved in this prosecution in the 1990s.

escrow which he refused to release to GUTIERREZ and ALLEVIATION and also refused to provide an accounting of these funds. See Jaime Gutierrez, MD, Alleviation Medical Services PA and JGG Medical Care, PC v. The Rybak Firm, PLLC, Oleg Rybak, Fisher & Fisher and Andrew S. Fisher, Index No. 260257-2014/BX.

35.     One of GUTIERREZ's claims in his lawsuit against his former attorney is that after he demanded an accounting and release of his client files, the attorney produced a purported engagement letter containing a pre-printed stamped signature in the name of "Jaime Gutierrez." GUTIERREZ alleges that the document produced is a forgery.

36.     GUTIERREZ further claims in his lawsuit that the attorney refused to release client files to GUTIERREZ and ALLEVIATION when they were sued by Geico Insurance Company (hereinafter "GEICO").  This assertion was referencing a complaint filed by GEICO in the United States District Court, Eastern District of New York against GUTIERREZ, ALLEVIATION and others.  The GEICO suit alleges that ALLEVIATION and a subsequent medical facility, JGG Medical Care, P.C., were fraudulently incorporated and that GUTIERREZ was the nominal rather than the actual owner. See Government Employees Insurance Co. v. Jean Claude Compas, 1:13-cv-01290 (E.D.N.Y. 2013).

37.     GUTIERREZ also alleges in his lawsuit that the attorney improperly induced him to enter into a settlement with GEICO that required him to waive numerous claims for reimbursement.  GUTIERREZ further alleged that he was notified by GEICO that it was continuing its investigation into claims filed by GUTIERREZ and ALLEVIATION, and that he was informed that the Office of the U.S. Attorney for the Southern District of New York and the FBI were conducting a criminal investigation into claims GUTIERREZ submitted to GEICO for reimbursement.

**The Defendants' Ineligibility to Receive No-Fault Benefits and
Misrepresentations Regarding the Services Supposedly Provided**

38.     The Defendants have engaged in a systematic scheme to defraud Plaintiffs by submitting bills under the New York No-Fault system for medical services that are unnecessary and that when rendered are performed by non-physicians, in a dangerous manner and by a fraudulently incorporated and operated entity.   To accomplish this scheme, GUTIERREZ and ALLEVIATION billed Allstate for medical services including trigger point injections under CPT Codes 20552 and 20553, "Outcome Assessment Testing" billed by the Defendants under CPT Code 99358, "Performance Tests and Measurements" billed by the Defendants under CPT Code 97750, office visits billed by the Defendants under CPT Code 99244 and follow-up examinations billed by the Defendants under CPT Code 99215.

39.     As stated in his own EUO testimony, GUTIERREZ doesn't know about many of the medical services he is supposedly rendering - including the amount of medications dispensed to patients and their safe dosages - further endangering the public's health.   GUTIERREZ's testimony also demonstrates that he knows very little about ALLEVIATION's operations and knows practically nothing about the medical services the Defendants bill for, indicating ALLEVIATION's fraudulent incorporation and its ownership and operation by non-medical professionals.

40.     GUTIERREZ and ALLEVIATION intentionally and knowingly submitted to ALLSTATE medical documentation, namely "NF-3" verification forms, that contain materially false information in order to fraudulently obtain No-fault reimbursement. The Defendants represented that all of the medical services billed (i) were performed by a physician, GUTIERREZ,  (ii) were medically necessary,  (iii) consisted of all of the components required by the Fee Schedule and (iv) that GUTIERREZ was ALLEVIATION's owner.

41.     The NF-3 claim forms require medical providers to indicate the name of the treating provider and that person's license or certification number (Box "16") and the names and professional licensing credentials of all owners (Box "17").

42.     The Defendants intentionally and knowingly represented on all NF-3 verification forms they submitted to ALLSTATE that GUTIERREZ was the "treating provider" of all medical services billed by the Defendants, even though he was not the "treating provider" of many of the services purportedly rendered.  In fact, as more fully discussed below, many of the medical services billed by the Defendants, if performed at all, were not performed by GUTIERREZ but by non-physicians not supervised by GUTIERREZ.

43.     The Defendants also intentionally and knowingly represented on all NF-3 verification forms they submitted to ALLSTATE that GUTIERREZ is the "owner" of ALLEVIATION, a professional service corporation, deeming GUTIERREZ and ALLEVIATION eligible to receive No-Fault benefits pursuant to Insurance Law §5102(a)(l) and 11 NYCRR § 65-3.l6(a)(12).  Although all claim forms submitted by the Defendants to Plaintiffs and records of the New York State Office of the Professions and the New York State Department of State provide that GUTIERREZ is ALLEVIATION's registered owner, according to GUTIERREZ's EUO testimony, the Defendants' bank records and patient EUO testimony, GUTIERREZ never truly owned, controlled or operated ALLEVIATION.

44.     Representative samples of the bills submitted by GUTIERREZ and ALLEVIATION to ALLSTATE are annexed hereto collectively as Exhibit "B".

**GUTIERREZ Testified That Non-Physicians Frequently**
**Perform the Medical Services Billed by the Defendants**

45.     On June 14, 2011, GUTIERREZ testified at an EUO where the services at issue consisted of medical examinations and trigger point injections billed by the Defendants to

Eveready Insurance Company (hereinafter "Eveready").  On December 9, 2011, GUTIERREZ testified at another EUO where the services at issue included medical examinations and trigger point injections, as well as Outcome Assessment Testing and Performance Tests and Measurements, billed by the Defendants to ALLSTATE.

46.    GUITIERREZ'S testimony at his EUOs not only supports the testimony of patients that he billed for services he did not provide but supports the pattern of lay ownership and control of the medical PC that was incorporated in his name.

47.    All billing documentation submitted by Defendants provides that the "treating provider" of all medical services was GUTIERREZ.  However, by GUTIERREZ's own admissions, corroborated by bank account information and patient EUO testimony, many medical services supposedly performed and then billed by the Defendants were performed by non-physicians.  For example, during GUTIERREZ's EUOs of June 14, 2011 and December 9, 2011, he testified in sum and substance that:

 i.  Although he is always listed as the "treating provider" on the NF-3 forms submitted to ALLSTATE, GUTIERREZ does not always perform the services billed, including the examinations and trigger point injections. GUTIERREZ testified that Physician Assistants perform these services. Specifically, when GUTIERREZ was asked "Okay.  Are you the only person for Alleviation that performs trigger point injections?" he responded "No."  When asked who else performs them, he stated "Um, a PA."

 ii.  When GUTIERREZ was asked why a Physician Assistant's name was not listed as the "treating provider" on any of the NF-3's, he responded:

"…Because I am the provider who is allowed to bill for this" and "…I don't know if PA can bill for – and she's my employee, so definitely it's mine. I don't think that it's proper to put her name down."

iii. Although he is listed as the "treating provider" on all of the NF-3 forms submitted to ALLSTATE, GUTIERREZ also testified that he does not conduct any of the Performance Tests and Measurements or any of the Outcome Assessment Testing billed. According to GUTIERREZ, the tests are performed by a "technician" named "Arthur," but he does not know Arthur's last name. When GUTIERREZ was asked "Does Arthur perform all of the outcome assessment test for Alleviation?" GUTIERREZ responded "He should." When GUTIERREZ was asked "Okay. And how about physical performance? That too?" GUTERRIEZ responded "Also, yes."

48.     GUTIERREZ's own admissions demonstrate that he was not the treating provider of many of the medical services billed by the Defendants. As all billing documentation submitted by the Defendants state that the "treating provider" of all services billed is always GUTIERREZ, the Defendants' NF-3's contain false and misleading misrepresentations, including that a physician was the treating provider of all medical services billed.

### GUTIERREZ Was Not Available To Supervise Treatment That Was Provided In His Name By Others

49.     GUTIERREZ clearly admitted that he did not provide many of the medical services that were billed in his name. According to his EUO testimony, the reason for this is that the persons who provided the services were not permitted to bill in their own names. If such persons cannot bill in their own names, they cannot provide the services without close

supervision.  The failure to provide such supervision is not only unprofessional conduct; it is a criminal offense. Not only did the Defendants submit bills in the name of GUTIERREZ for medical services he did not perform, but they submitted bills in his name for medical services that he did not even supervise.

50.     Part 29 of the NYS Rules of the Board of Regents states that unprofessional conduct includes "delegating professional responsibilities to a person when the licensee delegating such responsibilities knows or has reason to know that such person is not qualified, by training, by experience or by licensure, to perform them" Title 8, Part 29.1(10). The Rules further state that such conduct includes "failing to exercise appropriate supervision over persons who are authorized to practice only under the supervision of the licensed professional." Title 8, Part 29.2(5). Such conduct may also be a Class "E" felony under the Education Law which prohibits anyone from aiding or abetting an unlicensed person to practice a profession. Education Law § 6512(1).  A person who engages in this conduct may also be charged under the New York State Penal Law for intentionally aiding another person in conduct (i.e. unauthorized practice of medicine) that constitutes an offense. Penal Law §20.0.

51.     By not performing and not even supervising many of the medical services billed to ALLSTATE, GUTIERREZ is in violation of New York Education Law §§ 6512, 6522 and 6530, the New York State Rules of the Board of Regents §§ 29.1(5), 29.1(10) and 29.2(5) and potentially Penal Law § 20.00.

## The Defendants' Bank Records

52.     GUTIERREZ's admissions regarding the medical services billed in his name are corroborated by information and documentation contained in GUTIERREZ's and ALLEVIATION's bank account statements.

20

53.     As part of its investigation into GUTIERREZ and ALLEVIATION, ALLSTATE served a subpoena duces tecum to obtain copies of GUTIERREZ's and ALLEVIATION's bank account records in the action entitled <u>Alleviation Medical Services, P.C. a/a/o Simion Stephenson v. Allstate Insurance Company</u>, Index No. 739254-12/QU (N.Y. City Civil Court, Queens County).

54.     A review of the bank records produced by HSBC Bank USA reveals that GUTIERREZ was not in New York State and on many occasions not even in the United States on numerous dates of service where he was purportedly the "treating provider" of the medical services billed to ALLSTATE, in violation of the laws of the State of New York.

55.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients FR and AA on January 13, 2011.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on January 13, 2011, GUTIERREZ was in Florida, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated January 13, 2011 indicates that GUTIERREZ paid the Rickenbacker Marina, Key Biscayne, Florida, the sum of $60.31.

56.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient NE on February 9, 2011.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on February 9, 2011, GUTIERREZ was in Florida, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated February 9, 2011 indicates that GUTIERREZ paid the Rickenbacker Marina, Key Biscayne, Florida, the sum of $200.00.

57.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient MA on February 11, 2011.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on February 11, 2011, GUTIERREZ was in Florida, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated February 11, 2011 indicates that GUTIERREZ paid Metro Mart, Miami, Florida, the sum of $5.87.

58.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients LM and CH on April 19, 2011.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on April 19, 2011, GUTIERREZ was in Florida, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated April 19, 2011 indicates that GUTIERREZ paid the Rickenbacker Marina, Key Biscayne, Florida, the sum of $74.11.

59.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients SS and SP on May 19, 2011.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on May 19, 2011, GUTIERREZ was in Florida, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated May 19, 2011 indicates that GUTIERREZ paid Vigo & Vigo, Miami, Florida, the sum of $25.00.

60.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients AA and AE on May 24, 2011.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on May

24, 2011, GUTIERREZ was in Las Vegas, Nevada, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated May 24, 2011 indicates that GUTIERREZ paid Shell Oil, Las Vegas, Nevada, the sum of $26.45.

61.    Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients FR, NJ and RH on May 27, 2011.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on May 27, 2011, GUTIERREZ was in Tempe, Arizona, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated May 27, 2011 indicates that GUTIERREZ paid PF Changs, Tempe, Arizona, the sum of $32.90.

62.    Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient JB on July 5, 2011.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on July 5, 2011, GUTIERREZ was in the country of Panama, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated July 5, 2011 indicates that GUTIERREZ paid Adidas, Panama, the sum of $83.89.

63.    Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient JN on August 19, 2011.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on August 19, 2011, GUTIERREZ was in the country of Ukraine, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated August 19, 2011 indicates that GUTIERREZ paid Restaurant Fankoni, Odessa, Ukraine, the sum of $294.22.

64.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients AD and SL on September 2, 2011.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on September 2, 2011, GUTIERREZ was in the country of Greece, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated September 2, 2011 indicates that GUTIERREZ paid Electra Palace, Athens, Greece, the sum of $378.43.

65.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient AL on September 8, 2011.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on September 8, 2011, GUTIERREZ was in the country of Italy, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated September 8, 2011 indicates that GUTIERREZ paid Ristorante Pepenero, San Miniato, Italy, the sum of $111.84.

66.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient JJC on September 9, 2011.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on September 9, 2011, GUTIERREZ was in the country of Italy, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated September 9, 2011 indicates that GUTIERREZ paid Prada, Reggello, Italy, the sum of $408.74.

67.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient FN on November 9, 2011.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on November

9, 2011, GUTIERREZ was in Florida, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated November 9, 2011 indicates that GUTIERREZ paid Publix, Miami, Florida the sum of $13.70.

68.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients CG and AD on January 5, 2012.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on January 5, 2012, GUTIERREZ was in the country of Columbia, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated January 5, 2012 indicates that GUTIERREZ paid Hospederia Duruelo, Villa de Leyva, Columbia, the sum of $25.19.

69.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patients BB, EM, RH AND JD on January 6, 2012.  GUTIERREZ not only did not treat these patients but he did not supervise the services on this date.  Bank records show that on January 6, 2012, GUTIERREZ was in the country of Columbia, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated January 6, 2012 indicates that GUTIERREZ paid Aerostylos, Bogota D.C., Columbia, the sum of $32.91.

70.     Defendants billed ALLSTATE for medical services allegedly provided by GUTIERREZ to patient ET on February 6, 2012.  GUTIERREZ not only did not treat this patient but he did not supervise the services on this date.  Bank records show that on February 6, 2012, GUTIERREZ was in Florida, whereas the services billed by the Defendants were allegedly provided by GUTIERREZ in New York City.  For example, a transaction dated February 6, 2012 indicates that GUTIERREZ paid Baru Urbano, Miami, Florida, the sum of $153.46.

**Patient EUO Testimony Corroborates That Medical Services**
**Billed By Defendants Were Not Performed At All, Were Not**
**Performed As Billed and Were Not Performed by GUTIERREZ**

71.     On the NF-3 verification forms submitted to ALLSTATE, the Defendants billed for services including trigger point injections under CPT Codes 20552 and/or 20553, office visits under CPT Code 99244, follow-up examinations under CPT Code 99215, "Outcome Assessment" Testing under CPT Code 99358 and "Performance Tests and Measurements" under CPT Code 97750.  See Exhibit "B".

72.     Numerous patients have testified at EUOs that they never received any of the medical services billed by the Defendants, that they never received even close to the number of trigger point injections billed and when services were at least partially rendered, many have testified that they were not treated by GUTIERREZ but by a different individual.

73.     Moreover, according to the testimony of numerous patients, the Defendants misrepresented the extent and duration of the services actually performed.

74.     The following paragraphs summarize some of this patient testimony in relation to the services billed for each respective claimant.

**P.A. CLAIM:**

75.     ALLSTATE claimant P.A. alleged soft tissue injuries as a result of a motor vehicle accident.

76.     In relation to claimant P.A., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with sixteen trigger point injections[3] under CPT Code 20553, and a follow-up visit under CPT Code 99215 along with another twenty eight trigger point injections under CPT Code 20553.

---

[3] In their billing, the Defendants call these services "trigger point injections," and we will continue to refer to them as such, although as more fully discussed below they do not meet the medical definition of "trigger point injections."

According to the NF-3 forms submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

77.     Claimant P.A. testified that she met with an individual and received one trigger point injection on each of the two dates of service.  However, she testified that an individual other than GUTIERREZ met with her and performed the one trigger point injection on each date of service.

78.     According to claimant P.A., on the first date of service, she received no more than one injection, although the services billed by ALLEVIATION for the first date of service included the performance of sixteen trigger point injections.  On the second date of service, claimant P.A. stated that she received no more than one trigger point  injection, although the services billed by ALLEVIATION for the second date of service included the performance of twenty eight trigger point injections..

79.     Also according to claimant P.A., on the first date of service, the individual that performed the trigger point injection met with her for approximately thirty five minutes, although the services billed by ALLEVIATION included an office visit under CPT Code 99244.  As more fully discussed below, CPT Code 99244 requires three key components:  a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

80.     ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of P.A. that were otherwise non-compensable under New York State law.

**J.B. CLAIM:**

81.     ALLSTATE claimant J.B. alleged soft tissue injuries as a result of a motor vehicle accident.

82.     In relation to claimant J.B., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with twenty seven trigger point injections under CPT Code 20553, and a follow up visit under CPT Code 99215 along with another twenty trigger point injections under CPT Code 20553. According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

83.     Claimant J.B. testified that he received only three to four trigger point injections on each date of service.  However, the services billed by ALLEVIATION for the first date of service included the performance of twenty seven trigger point injections, and the services billed by ALLEVIATION for the second date of service included the performance of twenty trigger point injections.

84.     ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of J.B. that were otherwise non-compensable under New York State law.

**A.D. CLAIM:**

85.     ALLSTATE claimant A.D. claimed soft tissue injuries as a result of a motor vehicle accident.

86.     In relation to claimant A.D., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with twenty four trigger point injections under CPT Code 20553 on one date of service, a follow

up visit under CPT Code 99215 along with another eight trigger point injections under CPT Code 20553 on another date of service, and still another twenty trigger point injections on a third date of service.  According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

87.     Claimant A.D. testified that he met with an individual and received four trigger point injections on each of two dates of service.  However, claimant A.D. testified that an individual other than GUTIERREZ met with him and performed the four trigger point injections on each of the dates of service.

88.     Claimant A.D. also testified that on the first date of service, he received only four trigger point injections, although the services billed by ALLEVIATION for the first date of service included the performance of twenty four trigger point injections.  On the second date of service, claimant A.D. testified that he received only four trigger point injections, although the services billed by ALLEVIATION for the second date of service included the performance of eight trigger point injections.

89.     ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of A.D. that were otherwise non-compensable under New York State law.

**M.G. CLAIM:**

90.     ALLSTATE claimant M.G. claimed soft tissue injuries as a result of a motor vehicle accident.

91.     In relation to claimant M.G., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along

with three trigger point injections under CPT Code 20553. According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

92. Claimant M.G. testified that she met with an individual and received one trigger point injection on the date of service. However, she stated that an individual other than GUTIERREZ met with her and performed the one trigger point injection.

93. Claimant M.G. testified that on the date of service, she received only one trigger point injection. However, the services billed by ALLEVIATION included the performance of three trigger point injections.

94. ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of M.G. that were otherwise non-compensable under New York State law.

**J.J. CLAIM:**

95. ALLSTATE claimant J.J. claimed soft tissue injuries as a result of a motor vehicle accident.

96. In relation to claimant J.J., ALLEVIATION billed ALLSTATE for reimbursement of medical services. These included an office visit under CPT Code 99244 along with sixteen trigger point injections under CPT Code 20553, and then a follow up visit under CPT Code 99215 along with another sixteen trigger point injections under CPT Code 20553. According to the NF-3 form(s) submitted by Defendants, all services were performed by GUTIERREZ, a physician.

97. Claimant J.J. testified that on each date of service, he only received two trigger point injections. However, the services billed by ALLEVIATION for the first date of service included the performance of sixteen trigger point injections, and the services billed by

30

ALLEVIATION for the second date of service again included the performance of sixteen trigger point injections.

98.     Claimant J.J. also testified that the individual that performed the trigger point injections on the first date of service met with him for approximately thirty minutes, although the services billed by ALLEVIATION included an office visit under CPT Code 99244.  CPT Code 99244 requires three key components:  a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

99.     ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of J.J. that were otherwise non-compensable under New York State law.

**A.L. CLAIM:**

100.     ALLSTATE claimant A.L. claimed soft tissue injuries as a result of a motor vehicle accident.

101.     In relation to claimant A.L., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with twenty four trigger point injections under CPT Code 20553.  According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

102.     Claimant A.L. testified that he never received any trigger point injections at any time during his treatment.  He also did not receive any examination in conjunction with or in relation to the administration of trigger point injections.  However, the services billed by ALLEVIATION included the performance of twenty four trigger point injections to claimant A.L. and an office visit under CPT Code 99244.  CPT Code 99244 requires three key

31

components: a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

103.    ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of A.L. that were otherwise non-compensable under New York State law.

**A.M. CLAIM:**

104.    ALLSTATE claimant A.M. claimed soft tissue injuries as a result of a motor vehicle accident.

105.    In relation to claimant A.M., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with twenty four trigger point injections under CPT Code 20553. According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

106.    Claimant A.M. testified that she met with an individual and received five to six trigger point injections in her lower back and five to six trigger point injections in her neck. However, she testified that an individual other than GUTIERREZ met with her and performed the five to six trigger injections in her lower back and the five to six trigger point injections in her neck.

107.    Although claimant A.M. testified that on the date of service she received only five to six trigger point injections in her lower back and five to six trigger point injections in her neck, the services billed by ALLEVIATION included the performance of twenty four trigger point injections.

108.    Claimant A.M. also testified that the individual that performed the trigger point injections spent approximately five minutes with her on the date of service although the services billed by ALLEVIATION also included an office visit under CPT Code 99244.   CPT Code 99244 requires three key components:   a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

109.    ALLSTATE   reasonably   relied   upon   ALLEVIATION's   false   billing documentation in paying No-Fault benefits to or on behalf of A.M. that were otherwise non-compensable under New York State law.

**T.M. CLAIM:**

110.    ALLSTATE claimant T.M. claimed soft tissue injuries as a result of a motor vehicle accident.

111.    In relation to claimant T.M., GUTIERREZ billed ALLSTATE for reimbursement of medical services.   These included an office visit under CPT Code 99244 and Performance Tests and Measurements under CPT Code 97750.   According to the NF-3 form(s) submitted by Defendants, all services billed were performed by GUTIERREZ, a physician.

112.    Claimant T.M. testified that she did meet with an individual who examined her, but said that it was not GUTIERREZ.   With regard to the Performance Tests and Measurements, claimant T.M. stated that although an individual had her stand on a platform and pull on a bar attached to a chain, this individual was not GUTIERREZ.

113.    Claimant T.M. also testified that the individual that she met with spent approximately forty minutes with her on the date of service, although the services billed by ALLEVIATION included an office visit under CPT Code 99244.   CPT Code 99244 requires

three key components:  a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

114.    ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of T.M. that were otherwise non-compensable under New York State law.

**J.N. CLAIM:**

115.    ALLSTATE claimant J.N. claimed soft tissue injuries as a result of a motor vehicle accident.

116.    In relation to claimant J.N., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with thirty trigger point injections under CPT Code 20553.  According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

117.    Claimant J.N. testified that she received no more than five trigger point injections on the date of service, although the services billed by ALLEVIATION included the performance of thirty trigger point injections.

118.    Claimant J.N. also testified that the individual that she met with spent approximately five minutes with her on the date of service, although the services billed by ALLEVIATION included an office visit under CPT Code 99244.  CPT Code 99244 requires three key components: a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

119.     ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of J.N. that were otherwise non-compensable under New York State law.

**C.R. CLAIM:**

120.     ALLSTATE claimant C.R. claimed soft tissue injuries as a result of a motor vehicle accident.

121.     In relation to claimant C.R., GUTIERREZ billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with twenty two trigger point injections under CPT Code 20553, and a follow up visit under CPT Code 99215 along with eight trigger point injections under CPT Code 20553.  According to the NF-3 form(s) submitted by GUTIERREZ, all services were performed by GUTIERREZ, a physician.

122.     Claimant C.R. testified that she met with an individual and received trigger point injections on two dates of service; she received only four trigger point injections on the first date of service, and only four trigger point injections on the second date of service.  However, GUTERREZ billed for services included the performance of twenty two trigger point injections on the first date of service and eight trigger point injections on the second date of service.

123.     Claimant C.R. also testified that the individual that performed the trigger point injections did not perform any examination on either date of service, other than asking her on the second date of service where on her body she wanted to be injected.  However, the services billed by GUTIERREZ included an office visit under CPT Code 99244 and a follow-up visit under CPT Code 99215.  CPT Code 99244 requires three key components:  a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.  As more

fully discussed below, the follow-up visit under CPT Code 99215 requires two out of the following three key components:  a comprehensive history, a comprehensive examination and medical decision making of high complexity.   Usually, the presenting problem(s) are of moderate to high severity and physicians typically spend forty minutes face-to-face with the patient and/or family.  Both codes also provide that counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

124.    ALLSTATE   reasonably   relied   upon   ALLEVIATION's   false   billing documentation in paying No-Fault benefits to or on behalf of C.R. that were otherwise non-compensable under New York State law.

**J.R. CLAIM:**

125.    ALLSTATE claimant J.R. claimed soft tissue injuries as a result of a motor vehicle accident.

126.    In   relation   to   claimant   J.R.,   ALLEVIATION   billed   ALLSTATE   for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with fourteen trigger point injections under CPT CODE 20553, and then another sixteen trigger point   injections   under   CPT   Code   20553.    According   to   the   NF-3   form(s)   submitted   by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

127.    Claimant J.R. testified that on each date of service, he only received approximately five trigger point injections, although the services billed by ALLEVIATION for the first date of service included the performance of sixteen trigger point injections, and the services billed by ALLEVIATION for the second date of service again included the performance of sixteen trigger point injections.

128.    ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of J.R. that were otherwise non-compensable under New York State law.

**S.S. CLAIM:**

129.    ALLSTATE claimant S.S. claimed soft tissue injuries as a result of a motor vehicle accident.

130.    In relation to claimant S.S., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with twenty eight trigger point injections under CPT Code 20553, twenty four trigger point injections under CPT Code 20553 and a follow up visit under CPT Code 99215 along with another eighteen trigger point injections under CPT Code 20553.  According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

131.    Claimant S.S. testified that she received trigger point injections on three dates of service.  However, she testified that an individual other than GUTIERREZ performed the trigger point injections on two out of the three dates of service.

132.    Claimant S.S. also testified that on the first date of service, she received no more than eight trigger point injections, although the services billed by ALLEVIATION for the first date of service included the performance of twenty eight trigger point injections.  On the second date of service, claimant S.S. testified that she received no more than ten to fourteen trigger point injections, although the services billed by ALLEVIATION for the second date of service included the performance of twenty four trigger point injections.  On the third date of service, claimant S.S. testified that she received eighteen trigger point injections.  The services billed by

ALLEVIATION for the third date of service did include the performance of eighteen trigger point injections.

133.    Claimant S.S. also testified that the individual that she met with on the first date of service spent approximately fifteen to twenty minutes with her, although the services billed by ALLEVIATION included an office visit under CPT Code 99244.  CPT Code 99244 requires three key components:  a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

134.    ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of S.S. that were otherwise non-compensable under New York State law.

**C.W. CLAIM:**

135.    ALLSTATE claimant C.W. claimed soft tissue injuries as a result of a motor vehicle accident.

136.    In relation to claimant C.W., ALLEVIATION billed ALLSTATE for reimbursement of medical services.  These included an office visit under CPT Code 99244 along with twenty two trigger point injections under CPT Code 20553.  According to the NF-3 form(s) submitted by ALLEVIATION, all services were performed by GUTIERREZ, a physician.

137.    Claimant A.L. testified that she never received any trigger point injections at any time during her treatment.  In fact, she testified that an individual other than Gutierrez was ready to render the trigger point injections, but she refused to have them.  However, the services billed by ALLEVIATION included the performance of twenty two trigger point injections to claimant A.L.

138.    Claimant A.L. also testified that she did not receive any examination in conjunction with or in relation to the administration of trigger point injections, although the services billed by ALLEVIATION included an office visit under CPT Code 99244.  CPT Code 99244 requires three key components:  a comprehensive history, a comprehensive examination and medical decision making of moderate complexity; physicians typically spend sixty minutes face-to-face with the patient and/or family.

139.    ALLSTATE reasonably relied upon ALLEVIATION's false billing documentation in paying No-Fault benefits to or on behalf of C.W. that were otherwise non-compensable under New York State law.

### The Defendants' Actions Threaten Patient Health: The Trigger Point Injections Actually Rendered Lack Any Medical Necessity and Are Being Administered in a Potentially Dangerous Manner

140.    The Defendants' false and misleading misrepresentations to ALLSTATE include the submission of claims providing that the medical services billed and supposedly rendered to patients were medically necessary, were performed by physicians and incorporated the required components listed in the Fee Schedule.  This includes billing for reimbursement for the administration of trigger point injections.

141.    The Defendants' actions are clearly a threat to patients.  When the trigger point injections billed by the Defendants are actually performed, there is no medical necessity to administer them, they are likely to be administered by non-physicians with no supervision and they are being administered in a potentially dangerous manner.

142.    A trigger point injection involves the insertion of a needle into a patient's trigger point, and the needle usually contains a local anesthetic.  The clinical requirements for trigger point injections include a history of <u>chronic pain of at least three months' duration</u> along with

documentation of focal hyperirritable spots located in taut bands of skeletal muscle, and pain locally and in a referred pattern. According to the New York State Workers' Compensation Board Neck Injury Medical Treatment Guidelines and Mid and Low Back Injury Medical Treatment Guidelines, trigger point injections are not to be used for treating acute pain but for only subacute or chronic pain and are to be used only after failure of six weeks of other, conservative interventions. Furthermore, there should be three to four weeks between injections, which should be repeated only once, with a maximum duration of eight weeks.

143.   The Defendants bill for "trigger point injections" very early on in the respective patients' treatment without giving more conservative therapy an opportunity to effectively treat the patient. At the time of the initial evaluation when multiple trigger point injections are supposedly administered by the Defendants, none of the patients are in a "chronic" stage of pain, even if a broad definition of only three months is utilized to define chronic pain. On many occasions, the injections are allegedly performed only a few days after a patient's accident.

144.   The Defendants also bill for sets of trigger point injections on occasions that are sometimes within a few days of each other, although the New York State Workers' Compensation Board Guidelines provide that there should be at least three to four weeks between the performance of these injections and that they are not to be repeated more than once.

145.   Accordingly, any injections administered by the Defendants do not meet the definition of "trigger point injections," and there is clearly no medical necessity for this service.

146.   Even when trigger point injections are properly indicated, generally only a small amount of anesthetic agents are to be used. As with any medication, the amount of drug used should be kept to the lowest dose necessary. However, the dosages of the medications injected

during the Defendants' trigger point injections are much greater than recommended and may be toxic to patients.

147.    As part of the administration of their trigger point injections, the Defendants prepare boilerplate reports that describe the trigger point procedure and list the medications used - supposedly by GUTIERREZ - when injecting patients.  In the reports submitted to ALLSTATE, the Defendants describe using a combination of the following medications: Lidocaine, Depo-Medrol and Marcaine.  Representative samples of Defendants' "trigger point injection" reports are attached hereto as Exhibit "C".

148.    The majority of the trigger point injection reports submitted by the Defendants provide that each injection solution consists of 2% Lidocaine, 40 mg/cc of Depo-Medrol and either .25% or .5% Marcaine.  In most of the reports, next to "Number of cartridge injected," the space is either left blank or one of the following sets of numbers are written:  "2 x 3," "3 x 3," "4 x 3" or "2 x 10."  <u>According to the reports submitted by the Defendants, at least 240 mg, 360 mg, 480 mg or 800 mg of Depo-Medrol are injected into each patient on each date of service</u>.  See Exhibit "C".

149.    The Defendants' trigger point injections are potentially extremely harmful to the patients that actually receive them.  Depo-Medrol is a very strong cortisoid.  Its side effects can include:  nausea, vomiting, heartburn, headache, dizziness, trouble sleeping, appetite changes, increased sweating, acne and pain/redness/swelling at the injection site.  Depo-Medrol may also interact with aldesleukin, mifepristone, antibiotics, other drugs that weaken the immune response, other drugs that cause bleeding/bruising, azole antifungals, boceprevir, cyclosporine, estrogens, HIV protease inhibitors, rifamycins, St. John's wort, seizure medications and telaprevir.  Large doses of steroids such as Depo-Medrol also can lead to Cushing's syndrome

and elevated blood glucose levels, potentially causing or worsening diabetes and lowering an individual's ability to fight infections. The administration of Depo-Medrol can also suppress naturally occurring cortisol production, which can lead to adrenal insufficiency when the injected steroid is discontinued.

150.    Depo-Medrol is packaged with benzyl alcohol. The package insert for Depo-Medrol includes the following:

> This product contains benzyl alcohol which is potentially toxic when administered locally to neural tissue.
>
> The lowest possible dose of corticosteroid should be used to control the condition under treatment.
>
> The initial dosage of parenterally administered Depo-Medrol will vary from 4 to120 mg depending on the specific disease entity being treated. However, in certain overwhelming, acute, life-threatening situations, administrations in dosages exceeding the usual dosages may be justified and may be in multiples of the oral doses.

151.    According to the National Center for Emergency Medicine Informatics, when a focal trigger point is present, a dosage of 20 mg - 40 mg of Depo-Medrol should be injected, along with local anesthetics.

152.    The doses injected by the Defendants according to their own documentation - 240 mg, 360 mg, 480 mg or 800 mg - are significantly higher than the dosages recommended. If initial suggested dosages for Depo-Medrol vary from 4 to 120 mg, and usually consist of injecting 20-40 mg, the Defendants' injections of dosages of 240 mg, 360 mg, 480 mg or 800 mg of Depo-Medrol - as their medical reports indicate - could result in grave side effects including bleeding from the stomach or intestines, and possibly death.

153.    At GUTIERREZ's June 14, 2011 EUO, he admitted that <u>he did not know about the amount of medications to be dispensed when performing trigger point injections and their safe dosages.</u>

154.    GUTIERREZ testified in sum and substance to the following:

i.   He could not remember the safe amounts of the medications that are injected during the trigger point injection procedures.  Specifically, he stated "…Let me tell you this.  I didn't prepare for this.  I know, before I started doing this, I looked into which are the safe dosages, and I am working under the safe dosages.  At the moment, I don't remember what are they, and I don't want to give them to you right now…"

ii.  He testified that the documentation reflecting the trigger point injections that are submitted to insurance carriers needs to be corrected. Specifically, when asked "Why is .5 percent marked off?" GUTIERREZ responded "I think I need to correct this form" and "It looks like – I need to look into it more thoroughly.  I'm sorry."

iii. When GUTIERREZ was asked, "What has to be corrected on the forms?" He responded, "Be more explicit in terms of – you know, correct the Marcaine concentration, it looks like I didn't pay attention."

iv.  During his testimony, GUTIERREZ first maintained that he researched the medications injected and drafted the typewritten form submitted to insurance carriers in reference to the administration of the trigger point injections.  He then testified that he may have copied the form, but did not

> know its source.  He then stated that he probably obtained the form from another doctor, but was not sure.

> v.  When Gutierrez was questioned specifically regarding the Depo-Medrol dosages being injected into patients, he stated that he didn't "want to be in a discussion with the Board of Medicine..."  He then stated "I don't know the specifics about the amount or the safe dosage, but I know they're way higher.  I need to go back and refresh my mind that I'm using an unsafe mixture."

155.    From GUTIERREZ's EUO testimony, it is clear that GUTIERREZ has no or minimal knowledge regarding the safe dosages of the medications supposedly administered to patients, clearly posing a threat to patient health.

156.    Additionally, the trigger point injections billed by the Defendants are not medically necessary and do not satisfy all of the components required by the Fee Schedule.  The Defendants bill ALLSTATE for trigger point injections, supposedly performed by GUTTIEREZ, either under CPT code 20552 or under CPT code 20553.

157.    According to the Fee Schedule, CPT Code 20552 reflects the performance of injection(s), single or multiple trigger point(s), one or two muscle(s).  According to the Fee Schedule, CPT Code 20553 reflects the performance of injection(s), single or multiple trigger point(s), three or more muscle(s).  It is appropriate to bill under CPT Codes 20552 or 20553 only once per session even if there are multiple trigger point injections in three or more muscles.

158.    Defendants billed ALLSTATE separately under CPT codes 20552 and/or 20553 for each trigger point injection administered during the same session, sometimes billing

separately for more than twenty injections per session. Defendants should have billed only once each session either under CPT Code 20552 or CPT Code 20553.

### Defendants Bill For Other Services That Lack Medical Necessity and That Do Not Include the Components Required by the Fee Schedule

159.    On the NF-3 verification forms submitted to ALLSTATE, in addition to trigger point injections, the Defendants billed for office visits under CPT Code 99244, follow-up examinations under CPT Code 99215, "Outcome Assessment" Testing under CPT Code 99358 and "Performance Tests and Measurements" under CPT Code 97750.  See Exhibit "B".

160.    The Defendants made false and misleading representations to ALLSTATE by submitting claims providing that the testing, examinations and treatment purportedly rendered to patients were medically necessary.   The Defendants also made false and misleading representations to ALLSTATE by submitting claims that did not satisfy the required components of the Fee Schedule.

### Initial Consultations / Office Visits:

161.    The Defendants misrepresented the nature, extent and duration of the initial consultations and office visits billed to ALLSTATE.

162.    According to the Fee Schedule, CPT Code 99244 reflects an office consultation for a new or established patient.  The yardstick for a consultation is that one physician requests an opinion or advice from another physician or another appropriate source regarding the management of a specific problem.[4]  The service billed under this CPT code requires three key components:   a comprehensive history, a comprehensive examination and medical decision

---

[4] See Chapter 2 of the Worker's Compensation Fee Schedule ("Evaluation and Management") at Section 8, "Consultations (99241- 99255)."

making of moderate complexity.  Usually, the presenting problem(s) are of moderate to high severity and physicians typically spend sixty minutes face-to-face with the patient and/or family.

163.   According to the Fee Schedule, CPT Code 99215 reflects an office or other outpatient visit for the evaluation and management of an established patient.  It requires at least two of the following three key components:  A comprehensive history, a comprehensive examination and medical decision making of high complexity.  Usually, the presenting problem(s) are of moderate to high severity and physicians typically spend forty minutes face-to-face with the patient and/or family.

164.   As more fully discussed above, and as corroborated by patient EUO testimony, although the Defendants routinely bill for initial consultations and office visits under CPT Codes 99244 and 99215, neither GUTIERREZ or any individual spends the time required by the Fee Schedule with the patients.

165.   Also according to the Fee Schedule, both CPT Codes 99244 and 99215 each require the provision of counseling and/or coordination of care with other providers or agencies consistent with the nature of the problem(s) and the patient's and/or family's needs.  Specifically, a consultation billed under CPT code 99244 is supposed to have been requested by another physician or appropriate source.  However, GUTIERREZ specifically testified that he does not communicate with the patients' treating physician either before or after the administration of the trigger point injections.   In fact, <u>GUTIERREZ admitted that he does not speak with any physicians about any of the patients he purportedly treats.</u>

166.   It is also apparent from the billing documentation submitted by Defendants that patients were evaluated, if at all, utilizing the same "fill-in-the-blank" forms for the initial and follow-up evaluations.  None of the evaluations billed by Defendants included a comprehensive

history, a comprehensive examination or any medical decision making of high complexity as required by the Fee Schedule.  The reports do not include specific information about the quality of pain or factors that increase or decrease the symptoms. The physical examinations are extremely limited and are basically restricted to the presence of soft tissue findings such as "muscle tenderness to palpation."  The medical decision-making is straightforward and is limited to general recommendations of management by a chiropractor, an acupuncturist and pain management with multiple trigger point injections.  See Exhibit "C".  The consultations and follow-ups are clearly billed at a higher level than are justified by the reports submitted to ALLSTATE.

**Outcome Assessment Testing and Performance**
**Tests and Measurements / Physical Capacity Testing:**

167.    GUTIERREZ and ALLEVIATION also bill ALLSTATE for Outcome Assessment Testing under CPT Code 99358 and Performance Tests and Measurements / Physical Capacity Testing under CPT Code 97750.  No-Fault benefits only pay for medically necessary expenses; there is no medical necessity for these services.

168.    For example, none of the Defendants' initial or follow-up evaluation reports mentions the need for this testing.  Nor are the test results recorded in any of the follow-up evaluation reports, which were supposedly prepared by GUTIERREZ.

169.    GUTIERREZ testified that he never performed either of these tests <u>and did not know what the medical necessity was for performing them; he stated that he is not involved in that determination</u>.

170.    Although Gutierrez is listed as the "treating provider" on all of the NF-3 forms submitted to Allstate, he admitted that he never performs either the Outcome Assessment Testing or the Performance Test and Measurements.  He stated that they are performed by an individual

47

named "Arthur" but he did not know what certification or licensing this person holds.  He also did not know this individual's last name.

171.    During GUTIERREZ's EUO of December 9, 2011, GUTIERREZ specifically testified in sum and substance to the following:

    i.   When GUTIERREZ was asked whether the Performance Test and Measurements were medically necessary, GUTIERREZ stated "You need to ask Dr. Compas."

    ii.   When GUTIERREZ was asked "… what's the medical necessity of the outcome assessment test for this patient," GUTIERREZ stated "…I don't see the patient to perform this test.  Who decides what's the medical necessity is Dr. Compas.  So in this particular patient, even though I don't recollect, I wouldn't even know the whole story, or the whole problem with the patient…"

    iii.   When GUTIERREZ was asked if Arthur performs all of the Outcome Assessment Testing and the Performance Test and Measurements for all patients, GUTIERREZ responded "He should."

172.    ALLEVIATION and GUTIERREZ billed ALLSTATE for "Outcome Assessment Testing" under CPT Code 99358.  A representative sample of a report reflecting the Outcome Assessment Testing billed by the Defendants is attached hereto as Exhibit "D".

173.    According to the Fee Schedule, CPT Code 99358 reflects a prolonged evaluation and management service before and/or after direct (face-to-face) patient care (e.g., reviews of extensive records and tests, communication with other professionals and/or the patient/family.) However, GUTIERREZ admitted that he never performs these tests on patients.  He also

admitted that <u>he does not speak with any treating physician about any of the patients he supposedly treated.</u>

174.    ALLEVIATION's AND GUTIERREZ's use of CPT Code 99358 for the Outcome Assessment Testing is also fraudulent as it exaggerates the level of service provided to the patient, if provided at all.   The Defendants bill for Outcome Assessment Testing under CPT Code 99358 for the same dates of service billed by the Defendants for initial and follow-up examinations. This is merely a means for the Defendants to increase the billing for such examinations.

175.    Moreover, the reports reflecting the Outcome Assessment Testing are not signed by a physician and do not document any physician involvement before or after the testing.   The test results are only signed by the patient; they are not signed by GUTIERREZ, the physician who supposedly oversaw the performance of these tests.  See Exhibit "D".

176.    The information provided by the Outcome Assessment Testing is actually basic subjective information a physician or therapist obtains while taking a history.  Assigning a score and plotting a graph does not enhance the information and provides no benefit to a patient.

177.    The Defendants also billed ALLSTATE for the conduction of Performance Tests and Measurements under CPT Code 97750, and call it "Physical Capacity Testing" in their reports.   A representative sample of a report reflecting the Physical Performance / Physical Capacity Testing billed by the Defendants is attached hereto as Exhibit "E".   According to the Fee Schedule, CPT Code 97750 reflects a physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each fifteen minutes.

178.    Physical Performance Tests are intended to evaluate a patient's potential to return to work after an injury or to resume the activities of daily living.  However, the reports reflecting

the Physical Performance Tests submitted by the Defendants provide no information about the physical demands of the claimant's work or any other activity as required to perform a Physical Performance Test or to recommend the performance of such tests.

179.   The Physical Performance Tests purportedly rendered by the Defendants are also not tailored for each patient.  The same six isometric strength tests are apparently performed on all patients and every test involves three trials or eighteen movements.  See Exhibit "E".  As such, they are neither Physical Performance Tests nor Physical Capacity Tests but are tests that measure strength, which are part of the physical examination and should not be billed separately.

180.   The Defendants' billing for Physical Performance Tests is excessive even if it were proper to bill separately for them.  CPT Code 97750 is time-based and billing for evaluations under CPT code 97750 is to be in fifteen minute units.  The number of body areas treated does not determine how to bill for the evaluation.  However, in virtually every case where Physical Performance Tests are billed, the Defendants falsely state that the tests took between forty five minutes and an hour and a half.  See Exhibit "B".  No patient reported that this testing took anywhere near that amount of time.

181.   Moreover, there is also no documentation reflecting any involvement by GUTIERREZ in the performance or interpretation of this testing.   There is also no documentation that the results were utilized in the care of any of the patients.  Accordingly, these tests were inappropriately billed by Defendants as prolonged evaluation and management services before and/or after direct (face-to-face) patient care under CPT 99358 and as Performance Tests and Measurements / Physical Capacity Testing under CPT Code 97750.

### GUTIERREZ's Lack of Knowledge of ALLEVIATION's
### Operations and the Services Billed by the Defendants

182.    GUTIERREZ's testimony demonstrates that he knows very little about ALLEVIATION's operations and knows practically nothing about many of the medical services the Defendants bill for, indicating ALLEVIATION's fraudulent incorporation and its ownership and operation by non-medical professionals.

183.    For example, during GUTIERREZ's EUOs on June 14, 2011 and December 9, 2011, he testified in sum and substance that:

    i.    He is a plastic surgeon and his only practical experience in pain management is limited to treatment of some of his former plastic surgery patients.  He does not bill insurance carriers for these additional services since plastic surgery is a "cash business."

    ii.    When asked about his work schedule, GUTIERREZ stated that he calls "the office" if there are patients for him to see at the medical facilities he works out of.  When asked who he speaks with when he calls the office, he stated that he does not know either the first or last name of the receptionist(s) to whom he speaks.

    iii.    He could not recall the last name or address of an employee who supposedly performed his No-Fault billing from January to April 2011.

    iv.    GUTIERREZ did not know the spelling of the first name and initially did not know the last name of one of the two employees that supposedly work at ALLEVIATION's office. Specifically, when GUTTIEREZ was asked "You don't know your employee's last name?  You have to say yes or no" GUTIERREZ responded "I said no already."  However, after a break in

the EUO during which GUTIERREZ had a discussion with his attorneys, he provided the last name of one of the employees.

v.   GUTIERREZ was unaware how, specifically, the two employees who work at ALLEVIATION's office were hired.

vi.   GUTIERREZ did not know specifically how patient information was obtained in order to generate ALLEVIATION's billing documentation.

vii.   During his EUO of December 9, 2011, GUTIERREZ repeatedly referenced the patients who "come to him." However, when questioned about referrals and how the patients get to see him, he could not explain the specific process.

viii.   Although the Defendants frequently bill ALLSTATE for the conduction of Performance Tests and Measurements under CPT Code 97750, GUTIERREZ could not describe this test or state what it involves. He also could not define many of the terms referenced in the billing documentation submitted to ALLSTATE to obtain reimbursement for this test. For example, when billing for Performance Test & Measurements, the Defendants' NF-3 forms provide that the tests are for the "Arm Lift," the "Torso Lift," the "Leg Lift," the "High Far Lift," the "Floor Lift" and the "High Near Lift." See Exhibit "B." When asked what the "High Far Lift" is, GUTIERREZ stated "Um, high far lift? I have to look at the form that Arthur that gave me, and I'll know what exactly high far lift. I don't know the --." When asked what the "High Near Lift" was, GUTIERREZ responded "Exactly same thing. I just can't recollect."

52

ix.   When asked who performs the Performance Tests and Measurements and the Outcome Assessment Testing, GUTIERREZ said it was an individual named "Arthur" but was unsure of Arthur's last name.

x.   GUTIERREZ also did not specifically know how Arthur came to work for ALLEVIATION.

xi.   Although GUTIERREZ testified that Arthur worked for ALLEVIATION full time, he did not know Arthur's schedule and the hours he worked.  He also was unaware of whether Arthur worked for any entity or individual other than ALLEVIATION.

xii.   Although GUTIERREZ testified that Arthur had a license to perform Performance Tests and Measurements, he did not know the specific type of license nor its name.  When GUTIERREZ was asked what the name of the license was, he responded "I don't know the name."  When GUTIERREZ was then asked "…So he has the appropriate license, but you don't know what type of license it is?" GUTIERREZ stated "Right.  I don't know the exact wording for that type of license."

xiii.   When asked who else may have performed the tests billed by the Defendants, GUTIERREZ said there was another individual named "Alvi" present but was also unsure of Alvi's last name.

xiv.   GUTIERREZ testified that he was also unsure about what documentation is sent to insurance carriers when ALLEVIATION bills for Performance Tests and Measurements.  Specifically, when GUTIERREZ was asked "Is there something submitted to the insurance company with the NF3 for this

type of testing, the performance test and measurement?" he responded "I'm not sure."

xv. GUTIERREZ did not know which device, computer or computer programs are used to obtain and generate the results of the Performance Tests and Measurements. Although he testified that it was "rented," he did not remember from where it was rented.

xvi. GUTIERREZ also did not know the computer program used to obtain and generate the results of the Outcome Assessment Testing. Although he testified that it was also "rented," he did not remember from where.

### The Defendants' Fraudulent Concealment
### and ALLSTATE's Justifiable Reliance

184. The New York State Education Law regulates professional conduct and requires certain enumerated professionals, including physicians, to obtain a license in order to practice such professions lawfully. This statutory framework is designed to protect the public and to ensure that medical services are provided appropriately and only by licensed physicians.

185. The State of New York regulates the practice of medicine and restricts it and the ownership of medical professional corporations to licensed physicians. The State does so in order to protect consumers and the public health. Only licensed physicians, subject to the regulation and oversight of the State, are permitted to practice medicine.

186. Business Corporation Law §1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. BCL § 1507 provides as follows:

### Issuance of shares
A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a

> profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation … or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued … All shares issued, agreements made, or proxies granted in violation of this section shall be void.

187.    Legislative history confirms that the physician must not only be licensed to practice but must also be engaged in the practice of medicine in a medical professional corporation.  For example, in commenting on the proposed amendment to BCL § 1507 in 1971, the State Education Department, stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations. While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

188.    Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.
>
> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

189.    New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged.

190.    Copies of the memoranda referenced in paragraphs 186-189 above are collectively annexed to this Complaint as Exhibit "F".

191.    Allowing non-physicians to practice medicine through a professional corporation without proper supervision as well as GUTIERREZ's failure and/or inability to operate ALLEVIATION clearly compromises patient care and results in unnecessary services, as GUTIERREZ's and ALLEVIATION's operation is subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of a true doctor-owner.

192.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the medical services and the submission of charges to ALLSTATE.

193.    To induce ALLSTATE to promptly pay the fraudulent charges for the medical services billed, the Defendants have systematically attempted to conceal their fraud.

194.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that:  GUITTIEREZ did not administer many of the medical services billed although he is listed as the "treating provider" in all bills submitted to ALLSTATE, that instead a non-physician performed many of the medical services billed without proper supervision, that ALLEVIATION was unlawfully incorporated, owned and controlled by non-medical professionals and that it engaged in fee splitting.  In addition, the Defendants knowingly have misrepresented and concealed facts related to GUTIERREZ's ability to practice medicine through ALLEVIATION to prevent discovery that he was unable to own and operate this facility.

195.    The Defendants have hired one or more attorneys to pursue collection of the fraudulent charges from ALLSTATE and other insurers.  These attorneys routinely file expensive and time-consuming litigation against ALLSTATE and other insurers if the charges are not promptly paid in full.

196.    ALLSTATE is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents submitted to ALLSTATE in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause ALLSTATE to rely upon them.  As a result, ALLSTATE has incurred damages of more than One Hundred and Sixty-Nine Thousand Six Hundred Thirty Four Dollars and Nineteen Cents ($169,634.19) representing payments made by ALLSTATE to ALLEVIATION since its inception and damages of more than One Hundred and Sixty-Three Thousand Two Hundred and Thirty-One Dollars and Thirty-Seven Cents ($163,231.37) representing payments made by ALLSTATE to GUTIERREZ.

197.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from ALLSTATE, ALLSTATE did not discover, and could not reasonably have discovered, that its damages were attributable to fraud until after it made these payments to the Defendants.

### GUTIERREZ and ALLEVIATION
### Breached a Condition Precedent to Coverage

198.    Claims for No-Fault benefits were submitted by Defendants GUTIERREZ and ALLEVIATION to ALLSTATE for reimbursement under the No-Fault Law.  Upon receipt of these claims, ALLSTATE made timely requests for additional verification, including EUOs, of either GUTIERREZ or ALLEVIATION pursuant to 11 NYCRR § 65-3.5.

199.    The implementing regulations promulgated by the Superintendent of the New York State Department of Financial Services specifically provide that an insurance carrier may request any additional verification that it will require for an applicant to establish proof of claim, including, but not limited to, seeking additional verification in the form of an EUO. See 11 NYCRR § 65-3.5.

200.     Pursuant to 11 NYCRR § 65-1.1, applicants for No-Fault benefits are required to fully comply with the terms of coverage, including the attendance at an examination "under oath by any person named by the Company."  This prescribed No-Fault Mandatory Personal Injury Protection Endorsement establishes a condition precedent to coverage.  The provisions of the No-Fault regulations concerning EUOs are deemed to be a part of each of the subject policies. See Eagle Chiropractic, P.C. v. Chubb Indemnification Insurance Company, 859 N.Y.S.2d 902 (2d Dept. 2008). The following are the applicable insurance policy provisions:

**Section I, Conditions**

**Action Against Company.** No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage.

　　　*   *   *

**Notice.** In the event of an accident, written notice setting forth details sufficient to identify the eligible injured person, along with reasonably obtainable information regarding the time, place and circumstances of the accident, shall be given by, or on behalf of, each eligible injured person, to the Company, or any of the Company's authorized agents, as soon as reasonably practicable, but in no event more than 30 days after the date of the accident, unless the eligible injured person submits written proof providing clear and reasonable justification for the failure to comply with such time limitation. If an eligible injured person or that person's legal representative institutes a proceeding to recover damages for personal injury under section 5104(b) of the New York Insurance Law, a copy of the summons and complaint or other process served in connection with such action shall be forwarded as soon as practicable to the Company or any of the Company's authorized agents by such eligible injured person or that person's legal representative.

　　　*   *   *

**Proof of Claim; Medical, Work Loss, and Other Necessary Expenses.** In the case of a claim for health service expenses, the eligible injured person or that person's assignee or representative shall submit written proof of claim to the Company, including full particulars of the nature and extent of the injuries and treatment received and contemplated, as soon as reasonably practicable but, in no event later than 45 days after the date services are rendered. The eligible injured person or that person's representative shall submit

written proof of claim for work loss benefits and for other necessary expenses to the Company as soon as reasonably practicable but, in no event, later than 90 days after the work loss is incurred or the other necessary services are rendered. The foregoing time limitations for the submission of proof of claim shall apply unless the eligible injured person or that person's representative submits written proof providing clear and reasonable justification for the failure to comply with such time limitation. Upon request by the Company, the eligible injured person or that person's assignee or representative shall:

(a)   execute a written proof of claim under oath;

(b)   as may reasonably be required submit to examinations under oath by any person named by the Company and subscribe the same;

(c)   provide authorization that will enable the Company to obtain medical records; and

(d)   provide any other pertinent information that may assist the Company in determining the amount due and payable.

The eligible injured person shall submit to medical examination by physicians selected by, or acceptable to, the Company, when, and as often as, the Company may reasonably require.

201.   As indicated in the No-Fault implementing regulations and the insurance policy provisions cited in the paragraphs above, the failure of a medical provider and/or claimant to appear for an insurer's request for an EUO is a breach of a condition precedent to coverage under the No-Fault policy.  In the case of Unitrin Advantage Ins. Co. v. Bayshore Physical Therapy, PLLC., 92 N.Y.S.2d 473 (1st Dept. 2011), the Appellate Division of the First Department reasoned that a breach of a condition precedent to coverage under the No-Fault policy is an exception to the preclusion doctrine as set forth in Central Gen. Hosp. v. Chubb Group of Ins. Cos., 90 N.Y.2d 195 (N.Y. 1997) and as such, the insurer has the right to deny all claims retroactively to the date of loss, regardless of whether the denials were timely issued.

202.   In order to verify GUTIERREZ and ALLEVIATION's claims and determine the necessity and propriety thereof, ALLSTATE properly and timely noticed the Defendants for an

EUO with respect to each of the claims enumerated in Exhibit "G" on at least two separate occasions.

203.   The Defendants did not appear for EUOs on at least two scheduled dates with respect to each of the claims that are enumerated in Exhibit "G."  The dates that the EUOs were scheduled for are included in Exhibit "G".[5]

204.   Notwithstanding the fact that Allstate had a reasonable basis for requesting the Defendants to appear for an EUO, the Defendants failed to object to ALLSTATE's right to conduct an EUO.  It cannot now raise an issue regarding the reasonableness of the EUO requests. See Crescent Radiology, PLLC v. American Transit Ins. Co., 31 Misc.3d 134(A) (2d Dept. 2011); Jamaica Medical Supply Inc., v. Encompass Indem. Co., 36 Misc 3d 160(A) (2d Dept. 2012).

205.   The Defendants' failure to appear for the duly noticed EUOs is a violation of a condition precedent to coverage, thus rendering them ineligible to recover No-Fault benefits for the No-Fault claims enumerated in Exhibit "G".

## FIRST CAUSE OF ACTION
**(Declaratory Judgment That Defendants are not Entitled to Collect No-Fault Benefits Because Their Actions are Unlawful and Alleviation was Fraudulently Incorporated)**

206.   ALLSTATE repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

207.   GUTIERREZ and ALLEVIATION have no right to receive payments for any pending bills submitted to ALLSTATE because many of the medical services billed were not performed, and when performed were rendered in an unsafe manner and were not performed by

---

[5] GUTIERREZ appeared for an EUO of ALLEVIATION on February 21, 2012 regarding a group of claims separate from the ones listed in Exhibit "G".  However, the provider's attorneys would not permit Gutierrez to testify at that EUO.

GUTIERREZ but by non-physicians without proper supervision in violation of New York State law.

208.    GUTIERREZ and ALLEVIATION have no right to receive payments for any pending bills submitted to ALLSTATE because ALLEVIATION is fraudulently incorporated, owned and controlled by persons not licensed to practice medicine in New York State, and, therefore, ineligible to seek or recover No-Fault benefits.

209.    GUTIERREZ and ALLEVIATION have no right to receive payments for any pending bills submitted to ALLSTATE because ALLEVIATION is nominally owned "on paper" by a physician who has not engaged in the practice of medicine through this professional corporation, and therefore, are ineligible to seek or recover No-Fault benefits.

210.    GUTIERREZ and ALLEVIATION have no right to receive payments for any pending bills submitted to ALLSTATE because GUTIERREZ and ALLEVIATION engaged in unlawful fee splitting with non-medical professionals and, therefore, were never eligible to recover No-Fault benefits.

211.    GUTIERREZ and ALLEVIATION have no right to receive payments for any pending bills submitted to ALLSTATE because they made false and fraudulent misrepresentations to ALLSTATE by submitting numerous claims providing that medical services were rendered, that all medical services were rendered by GUTIERREZ, a physician, that the medical services were medically necessary and consisted of the required components as provided in the Fee Schedule.

212.    GUTIERREZ and ALLEVIATION continue to submit assigned No-Fault claims to ALLSTATE and to commence litigation and arbitrations against Allstate.

213.    A justiciable controversy exists between ALLSTATE and the Defendants since they challenge ALLSTATE 'S ability to deny such claims.

214.    ALLSTATE has no adequate remedy at law.

215.    GUTIERREZ and ALLEVIATION will continue to bill ALLSTATE for No-Fault services absent a declaration by this Court that their activities are unlawful and that ALLSTATE has no obligation to pay pending and future No-Fault claims submitted by GUTIERREZ and ALLEVIATION.

216.    Accordingly, ALLSTATE requests a declaration by this Court that the Defendant's activities are unlawful and that ALLSTATE has no obligation to pay pending and future No-Fault claims submitted by GUTIERREZ and ALLEVIATION.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment that Defendants are Not Entitled to**
**Collect No-Fault Benefits for the Claims Listed in Exhibit "G"**
**Because They Breached a Condition Precedent to Coverage)**

217.    ALLSTATE repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

218.    GUTIERREZ and ALLEVIATION are ineligible to receive payments for any pending No Fault claims, arbitration and litigation cases filed by the Defendants as listed in Exhibit "G" because the Defendants failed to appear for EUOs with respect to all No-Fault claims listed in Exhibit "G."

219.    GUTIERREZ and ALLEVIATION submitted bills for medical services for treatment of injuries allegedly sustained in motor vehicle accidents that occurred during the use and operation of motor vehicles insured by ALLSTATE.

220.    ALLSTATE properly and timely notified GUTIERREZ and ALLEVIATION for EUOs scheduled for at least two separate dates for each of the claims listed in Exhibit "G."

221. GUTIERREZ or ALLEVIATION failed to appear for each of the scheduled EUOs.

222. The Defendants' failure to appear for each of the scheduled EUOs is a breach of a condition precedent to coverage pursuant to the regulations promulgated by the Superintendent of Financial Services, which is also included as a mandatory endorsement in the relevant policies of insurance.

223. The Defendants are not entitled to recover benefits for medical services assigned to them by the claimants listed in Exhibit "G" because they failed to provide additional verification in the form of an EUO, thus violating a condition precedent to coverage for each of these claims.

224. A justiciable controversy exists between ALLSTATE and the Defendants with respect to the claims listed in Exhibit "G" because the Defendants contest ALLSTATE's ability to deny such claims.

225. ALLSTATE has no adequate remedy at law.

226. GUTIERREZ and ALLEVIATION will continue to bill ALLSTATE and seek reimbursement for the No-Fault claims enumerated in Exhibit "G" absent a declaration by this Court that the Defendants violated a condition precedent to coverage by failing to comply with the Plaintiff's request for additional verification in the form of an EUO with respect to these No-Fault claims. As a consequence, ALLSTATE has no obligation to pay or reimburse first-party No-Fault benefits for any of the No-Fault claims enumerated in Exhibit "G."

227. Accordingly, ALLSTATE requests a declaration by this Court that ALLSTATE has no obligation to pay or reimburse first-party No-Fault benefits for any of the No Fault claims, arbitration and litigation cases filed by the Defendants as enumerated in Exhibit "G".

## THIRD CAUSE OF ACTION
### (Common Law Fraud)

228.    ALLSTATE repeats and realleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

229.    The Defendants herein made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE in the course of their submission of thousands of fraudulent bills seeking payment for medical services.

230.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

   i.   the representation that all of the medical services billed were rendered;

   ii.  the representation that all of the medical services billed were rendered by GUTIERREZ, a physician, in compliance with New York Education Law §§ 6512, 6522 and 6530, the New York State Rules of the Board of Regents §§ 29.1(5), 29.1(10) and 29.2(5) and Penal Law § 20.00;

   iii. the representation that GUTIERREZ supervised all of the medical services billed by the Defendants in compliance with New York Education Law §§ 6512, 6522 and 6530, the New York State Rules of the Board of Regents §§ 29.1(5), 29.1(10) and 29.2(5) and Penal Law § 20.00;

   iv.  the representation that ALLEVIATION is properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by non-medical professionals;

v.  the representation that ALLEVIATION is properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is owned on paper by a physician who does not engage in the practice of medicine through the professional corporation;

vi.  the representation that ALLEVIATION is properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engages in the illegal splitting of fees with non-physicians;

vii. the representation that the services provided were medically necessary; and

viii. the representation that the services billed consisted of the required components as provided in the Fee Schedule.

231.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

232.    Upon information and belief, the Defendants knew the foregoing material misrepresentations to be false when made and made or facilitated these false representations with the intention and purpose of inducing ALLSTATE to rely thereon.

233.    ALLSTATE justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result has incurred damages totaling more than Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56) based -upon the fraudulent charges.

234.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

235.     Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, together with interest and costs, and any other relief this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### (New York General Business Law § 349)

236.     ALLSTATE repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

237.     New York General Business Law § 349 prohibits deceptive acts and practices by any business, and provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." See N.Y. Gen Bus § 349(a).  New York General Business Law also provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." See N.Y. Gen Bus § 349(h).  The court may also award reasonable attorney's fees to a prevailing plaintiff.  Id.

238.     Each separate bill, medical record and report submitted to ALLSTATE by the Defendants constituted a separate violation of General Business Law § 349.

239.     Upon information and belief, these deceptive acts were committed knowingly and maliciously with intent to deceive ALLSTATE and the public.

240.     Upon information and belief, the Defendants knew that their representations and/or omissions or the representations/omissions they were facilitating were deceptive and that they would be relied upon by ALLSTATE.  Such representations included that all of the medical

services billed were rendered, that they were rendered by GUTIERREZ, a physician, that GUTIERREZ supervised all of the medical services billed by the Defendants, that ALLEVIATION is properly licensed, and therefore, eligible to receive No-Fault benefits, that the services actually provided were medically necessary and that the services billed consisted of the required components as provided in the Fee Schedule.

241. The Defendants' false claims were deceptive and misleading and were relied upon by ALLSTATE in making their claim payments to GUTIERREZ and ALLEVIATION.

242. ALLSTATE has been damaged by the Defendants' actions in that ALLSTATE made substantial claim payments to GUTIERREZ and ALLEVIATION in excess of Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56).

243. By reason of the foregoing, ALLSTATE is entitled to recover its actual damages or enhanced damages in an amount to be determined at trial. ALLSTATE also is entitled to its reasonable attorney fees and costs in bringing this action pursuant to N.Y. Gen Bus § 349(h). This Court should also declare that ALLEVIATION has been formed contrary to law, that the Defendants operated in violation of the law and that ALLSTATE has no obligation to make any payments to GUTIERREZ and ALLEVIATION on pending and future No-Fault claims.

**FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**

244. ALLSTATE repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

245. As set forth above, GUTIERREZ, JOHN DOE ONE through JOHN DOE FIVE and ALLEVIATION has engaged in improper, unlawful and/or unjust acts, all to the harm and detriment of ALLSTATE.

246.    When ALLSTATE paid the bills and charges submitted by or on behalf of GUTTIEREZ and ALLEVIATION, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful and/or unjust acts.

247.    GUTIERREZ, JOHN DOE ONE through JOHN DOE FIVE and ALLEVIATION have been enriched at ALLSTATE's expense by ALLSTATE's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

248.    The Defendants' retention of ALLSTATE's payments violates fundamental principles of justice, equity and good conscience.

249.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56).

## JURY DEMAND

250.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, ALLSTATE respectfully prays that judgment be entered in its favor against the Defendants named in each Claim for Relief, jointly and severally, as follows:

## On the First Cause of Action

(a) DECLARE that ALLSTATE is not required to pay or reimburse GUTIERREZ and ALLEVIATION for first-party No-Fault benefits because: i) many of the medical services billed were not performed or were performed in a dangerous manner and by non-physicians without proper supervision; ii) ALLEVIATION is fraudulently incorporated, owned and controlled by persons not licensed to practice medicine in New York State, and therefore ineligible to seek or

recover No-Fault benefits; iii) ALLEVIATION is nominally owned "on paper" by a physician who has not engaged in the practice of medicine through this professional corporation, and therefore, is ineligible to seek or recover No-Fault benefits; (iv) GUTIERREZ and ALLEVIATION engaged in unlawful fee splitting with non-medical professionals and, therefore, were never eligible to recover No-Fault benefits; and, (v) the Defendants made false and fraudulent misrepresentations to ALLSTATE by submitting numerous claims providing that medical services were rendered, that all medical services were rendered by GUTIERREZ, a physician, and that the medical services were medically necessary and consisted of the required components as provided in the Fee Schedule;

(b) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and,

(c) GRANT all other relief this Court deems just.

### On the Second Cause of Action

(a) DECLARE that ALLSTATE is not required to pay or reimburse GUTIERREZ and ALLEVIATION for first-party No-Fault benefits for all claims enumerated in Exhibit "G" because GUTIERREZ and ALLEVIATION failed to comply with ALLSTATE's request for additional verification in the form of an EUO, thus breaching a condition precedent to coverage;

(b) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and,

(c) GRANT all other relief this Court deems just.

### On the Third Cause of Action

(a) GRANT compensatory damages to ALLSTATE for an amount to be determined at trial but in excess of Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five

Dollars and Fifty-Six Cents ($332,865.56), plus ALLSTATE's costs in this suit, including reasonable attorneys' fees; and,

(b) GRANT all other relief this Court deems just.

### On the Fourth Cause of Action

(a) GRANT compensatory damages to ALLSTATE for an amount to be determined at trial but in excess of Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56), plus ALLSTATE's costs in this suit, including reasonable attorneys' fees; and,

(b) GRANT all other relief this Court deems just.

### On the Fifth Cause of Action

(a) GRANT damages to ALLSTATE for unjust enrichment in an amount to be determined at trial but in excess of Three Hundred and Thirty-Two Thousand Eight Hundred and Sixty-Five Dollars and Fifty-Six Cents ($332,865.56), plus ALLSTATE's costs in this suit, including reasonable attorneys' fees; and,

(b) GRANT all other relief this Court deems just.


Dated:        New York, New York
              February 28, 2017

                                        ABRAMS, COHEN & ASSOCIATES


                                        _____/s/_____
                                        Ellen Burach Zion (EB 7999)
                                        Frank Piccininni (FP 0776)
                                        Barry Cohen (BC 9825)
                                        5 Hanover Square, Suite 1601
                                        New York, New York 10004
                                        (646) 449-7490
                                        File No.:  AAL
                                        *Counsel for Plaintiffs*